| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| NEUTROGENA CORPORATION, | ) | CASE NO.:  CV08-05552 AHM (CWx) |
| Plaintiff, | ) | |
| v. | ) | PRELIMINARY INJUNCTION |
| STEPHEN C. MATT, et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |

On September 29, 2008, the Court held a hearing on its Order to Show Cause regarding a preliminary injunction. At the hearing the Court made findings, which are reflected in part in the attached "Chronology" (Ex. A) and "Balance Sheet" (Ex. B), and concluded that as to the key disputed component of the requested relief -- whether Defendant should be effectively precluded from commencing employment with Guthy-Renker -- Plaintiff failed to meet its burden under Federal Rule of Civil Procedure 65. Plaintiff failed to demonstrate a likelihood of success on the merits of its claims, in particular the trade secret misappropriation claim, Computer Fraud and Abuse Act claim, and breach of contract claim, and the evidence showed that the balance of hardships favored Defendant. Based on the findings and conclusions

stated on the record, the Court dissolves the Temporary Restraining Order and enters an injunction as follows.

## **PRELIMINARY INJUNCTION**

Pending trial of this action, Defendant Stephen C. Matt ("Matt" or "Defendant") IS HEREBY ENJOINED from:

(1) retaining or refusing to return to Neutrogena any of its property, including but not limited to electronic documents, storage devices, and other things in their possession, custody, or control, including those that reflect, refer or relate to Neutrogena's Confidential Information derived by or provided to Matt in connection with his former relationship with Neutrogena. "Confidential Information" means and includes the following:

(a) New Product Pipeline: New product information, including market share projections and marketing and sales strategies for products Neutrogena had not yet released or announced in the marketplace; research and development ("R&D") information concerning products that Neutrogena was or is in the process of developing; how much money Neutrogena should spend on continuing to develop products under development; any strengths, advantages or weaknesses posed by products either scheduled for release or in the research and development stage; the proposed date when a new product will be ready for launch into the marketplace; market research results for a new product; the effect such new products will have on Neutrogena and competitor market share; and how the new product should be best positioned in the marketplace to respond to or anticipate competing products by competitors.

(b) Financial Information: Financial information including costs of goods projections, average selling price for Neutrogena's products, average spending on marketing programs, and amount of money in the budget devoted to development and marketing of a new product.

(c) Strategic Planning: Non-public information from Neutrogena's yearly

strategic planning process, which maps out Neutrogena's competitive strategies for a period of years. Such information includes Neutrogena's marketing strategies, new products in development, how those products fit within the competitive strategy and the timeline for launching new products; the amounts of money Neutrogena has devoted and intends to devote to different portions of Neutrogena's budget, including specific R&D projects and marketing efforts for different projects; the customer base Neutrogena intends to target in the coming years; and the competitive landscape, including market share of Neutrogena and its competitors, and how Neutrogena will respond in the coming years.

(d) Third-Party Partnership or Licensing Arrangements or Negotiations: Prospective and completed strategic partnerships and licensing agreement information, including the terms offered in order to negotiate and finalize deals with third parties for the licensing or acquisition of intellectual property rights in products or technologies intended to be used in combination with existing or prospective Neutrogena products; how such rights fit within Neutrogena's strategic plan and its efforts to address the competitive landscape; the level of importance for completing a prospective partnership or licensing arrangement with third parties; and how such rights will contribute to Neutrogena's new product pipeline; and

(2) directly or indirectly using, disclosing or transmitting any Confidential Information of Neutrogena or of its subsidiaries that Matt derived or acquired as a result of his former employment with Neutrogena.

//
//
//
//
//
//

3

1 **SECURITY**

2 Plaintiff has already posted a bond of five thousand dollars ($5,000) as security. No
3 additional surety is required.

6 DATE: September 29, 2008

_____
A. Howard Matz
United States District Judge

Exhibit A

*Neutrogena Corp. v. Matt*
CV 08-5552

## CHRONOLOGY

| Date | Event | Source |
|---|---|---|
| October 2001 | Beginning of Matt's employment | Ferguson Decl. ¶ 5; Matt Decl. ¶ 2. |
| October 2005 | Matt became Director of Interactive Marketing and Alternate Channels. His department has been outsourced to Fujo, Inc. Other than his assistant (Kristin DeLeo), who is a Neutrogena employee, Matt works only with Fujo employees. His main Fujo "co-worker" is Sandy Johnson. | Matt Decl. ¶¶ 3, 5. |
| Monday 7/28/08 10 a.m. | Matt met with Sandy Johnson in Matt's office to inform her that he was resigning. Matt expressed concern that Johnson did not have documents on his laptop that she might need, documents that were not on the shared drive. Matt told her he would download the documents for her. Johnson said that was OK, and Matt started downloading. Johnson assisted Matt in downloading from his laptop to a separate hard drive, helping him deal with some technical glitches.<br><br>Johnson Decl.'s account of this meeting was limited and is consistent with Matt Decl.: Johnson did not ask Matt for any specific computer files or ask Matt to download anything into a separate hard drive.<br><br>Matt visited Diane Foster in her office. She says he told her that he had taken home his personal things and had copied and downloaded all of his computer files, which he was going to give to Johnson. | Matt Decl. ¶¶ 8-9;<br><br>Johnson Decl. ¶ 5.<br><br>Matt Supp. Decl. ¶ 16; Foster Decl. ¶ 5. |
| 7/28/08 3:30 | Matt met with supervisor, Stefano Curti, to tender his resignation and inform him that he was going to work for Guthy-Renker as VP of Digital Marketing. Matt said nothing about copying the hard drive. | Matt Decl. ¶ 12; Curti Decl. ¶ 24. |

1

| Tuesday 7/29/08 10 a.m. | Curti and Anthony Ferguson, Director of HR, told Matt that he would be released that day and paid through August 8.  Curti reminded Matt of confidentiality obligations; Matt stated he understood and he was not taking any Neutrogena property with him.  Matt turned in his laptop, office keys, security badge, credit card, and Blackberry.  Curti and Ferguson did not ask about any files or electronic data. | Matt Decl. ¶ 13, Curti Decl. ¶¶ 25-27. |
|---|---|---|
| 7/29/08 | Sandy was not at office that morning, so Matt was not able to hand her the hard drive in person as he had planned.  Matt decided to hold onto it and arrange to get it to her by August 8. | Matt Decl. ¶ 14. |
| 7/30/08 - 8/3/08 | Matt went on preplanned trip to Laguna Beach. | Matt Decl. ¶ 15. |
| Thursday 7/31/08 | Matt called Sandy Johnson from Laguna Beach re hard drive.  Matt stated he would be back on Sunday night and would call on Monday, August 4 to make arrangements to get the hard drive to her. | Matt Decl. ¶ 15. |
| Monday 8/4/08 | Matt called Johnson re courier arrangements.  Matt told Johnson that he had just received a hostile letter from Neutrogena's counsel, Mark Neubauer.  Johnson said don't worry about it, she knew Matt had copied the hard drive to give to her. | Matt Decl. ¶ 16. |
| 8/4/08 | Matt had second thoughts about giving Johnson the hard drive, given the letter from Neutrogena's counsel.  That afternoon Matt sought advice of attorney, upon recommendation of friends. | Matt Decl. ¶ 17. |
| 8/5/08 | Matt met with counsel and handed him the hard drive.  Counsel subsequently returned hard drive to Neutrogena.  The hard drive contained 1902 electronic folders, with 11,625 computer files and 43,613 documents.  Included were such undisputed confidential items as a digital recommendation for implementation of a new internet marketing campaign, a detailed budget and strategy for all of skin iD marketing for 2008, a performance report for mid-July 2008, and other items. | Matt Decl. ¶ 17. Curti Decl. ¶ 37. |
| 8/22/08 | Neutrogena filed this action. | |

2

| 9/3/08 | Parties filed stipulation re scheduling of EPA TRO. | |
|---|---|---|
| 9/13/08 | Matt spoke with Diane Foster.  Foster reminded him of their conversation on July 28.  Foster told Matt about conversation she had with Jim Colleran, Pres. of Neutrogena, about Matt. | Matt Supp Decl. ¶ 16; Foster Decl. ¶ 6. |
| 9/16/08 | Court issued TRO and OSC.  Hearing scheduled for 9/29. | |

Exhibit B

*Neutrogena Corp. v. Matt*

BALANCE SHEET

| **Plaintiff** | **Defendant** |
|---|---|
| Matt copied entire hard drive instead of only files that Johnson needed or was entitled to access. Matt never explained why he did not simply give his laptop to Johnson, instead of going through the trouble of copying his laptop hard drive onto a portable hard drive. | Matt told Johnson he was going to give her all of his files. Matt told Foster he was going to give Johnson his files. |
| At the exit interview, Matt handed over his laptop and Blackberry, but did not mention or hand over the portable hard drive. | |
| | Neutrogena has no evidence Matt "copied" files from the server, only that he "accessed" (unspecified) files on the server. |
| | After he was unable to hand Johnson the drive in person, he made arrangements to courier them to her. |
| Matt may have understated his overall role in skin iD. According to Curti (Second Supp. Decl.), from January 2007 to his resignation, at least 50% of his duties were related to skin iD. According to Combredet and Curti, Matt and Combredet were in charge of the direct-to-consumer marketing, and rest of the team reported to the two. | According to Matt (Supp. Decl.), from January 2007 to his resignation, 85% of his job was focused on activities unrelated to skin iD. The person "truly in charge of day-to-day marketing for skin iD" was former colleague Laurent Combredet. His role in skin iD was limited to research the general direct-to-consumer market, consumer search trends, and consumer relationship marketing. |

| | |
|---|---|
| According to Curti, Matt worked with Combredet in developing packaging for skin iD and participated in regular meetings regarding the product and formula development for skin iD. Person who developed telemarketing scripts reported directly to Matt. | Contrary to Curti, Matt states he did not work in packaging development for skin iD, in product and formula development for skin iD, or in development of telemarketing scripts. |
| | Matt is not doing marketing specifically for Proactiv. He is doing Internet Marketing generally, for all brands at Guthy-Renker. This job does not need or utilized particularized knowledge of any product lines or industries. |
| | Guthy-Renker did not recruit Matt. Matt applied for the publicly advertised opening. |
| | Sugarman and Eisen stated in sworn declarations that they have not and will not ask for Neutrogena information. |
| | Plaintiff argues that even if Matt has returned all the files, he still knows confidential information and threatens to misappropriate it, so he "needs to be taken out of" his new job. |
| | Balance of hardships favors Matt. Matt has returned all of the files and retains no files. His new job does not call for him to recall any information specific to skin iD. The requested injunction would prohibit his employment. |

2